[No. 54460-8-I.   Division One.   July 5, 2005.]

SPECTRUM GLASS COMPANY, INC., *Appellant*, v. PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, *Respondent*.

304

*Phillip H. Ginsberg* and *Shelley M. Hall* (of *Stokes Lawrence*), for appellant.

*Michael A. Goldfarb* and *Christopher C. Cramer* (of *Law Office of Michael A. Goldfarb*), for respondent.

¶1 SCHINDLER, J. — Spectrum Glass Company (Spectrum) contends the trial court erred in dismissing its breach of contract and promissory estoppel claims against Snohomish County Public Utility District No. 1 (the PUD) on summary judgment. Spectrum claims there are material issues of fact regarding whether the rate contained in its Bridge Contract with the PUD was subject to change and whether the PUD promised Spectrum a fixed rate. We conclude the only reasonable inference from the extrinsic evidence is that the rate in the Bridge Contract was subject to change. Because the applicable rate was set by contract, Spectrum's promissory estoppel claim fails as a matter of law. We affirm the trial court's decision to dismiss Spectrum's claims for breach of contract and promissory estoppel.

## FACTS

¶2 Spectrum is a glass manufacturer that has operated a factory in Snohomish County since 1979. Spectrum's manufacturing process is energy-intensive because the glass furnaces used in Spectrum's factory must be kept continuously hot to prevent molten glass from hardening and destroying the furnaces. The PUD is a municipal corporation that supplies power and water to residents of Snohomish County and Camano Island. The Board of Commissioners of the PUD (the Commission) has the exclusive authority to set utility rates, and the Commission

is required to charge the lowest rates sufficient to cover its costs.[1] Spectrum is the PUD's 16th-largest electricity customer.

¶3 Since at least 1983, Spectrum purchased electricity from the PUD under the PUD's Rate Schedule 35. Schedule 35 is a "closed" rate schedule that was available and limited to certain customers who purchased electricity from the PUD under that rate schedule as of November 1, 1983.[2] Over the years, there have been several different versions of Rate Schedule 35 with different rates set by the Commission. It is undisputed that in 1995, Spectrum knew the rates under Rate Schedule 35 had changed in the past and were subject to change in the future.

¶4 In May 1995, Spectrum told the PUD it was planning to expand its manufacturing facility and would have increased electricity needs. Spectrum wanted a fixed rate with the PUD and a reliable electricity source that would prevent power outages.

¶5 In 1996, other electric utilities solicited the PUD's largest customers to buy electricity at lower wholesale electricity rates than the PUD was able to offer under its existing supply contract with the Bonneville Power Administration. To avoid losing customers, the PUD proposed a new rate schedule and energy contract for its largest customers. In August 1996, the Commission, in Resolution 4525, adopted Schedule 50, a new rate schedule for "market-based service," and a contract for sales under Schedule 50.[3] The PUD planned to buy large blocks of electricity at a low, wholesale price and enter into four- or five-year fixed rate contracts with its larger customers in order to provide the Schedule 50 rates. The Schedule 50 contracts would result in savings to the PUD's larger customers.

¶6 Under Schedule 50, eligible customers could choose between a fixed or an adjustable rate. The pricing methodology in Schedule 50 allowed the PUD to negotiate dis-

[1] *See* RCW 54.24.080.

[2] Clerk's Papers (CP) at 120.

[3] CP at 60.

counts for each customer based on the cost of providing service to that customer. Schedule 50 also allowed a customer to purchase electricity service from the PUD upon termination of the Schedule 50 contract under "then-existing rate schedules."[4]

¶7 Spectrum was eligible for a Schedule 50 contract. But because the Commission had not yet had time to negotiate a Schedule 50 contract with Spectrum in December 1996, Spectrum and the PUD entered into a five-year contract for electricity service under Schedule 35, the Primary Service Contract.[5] The Primary Service Contract provided Spectrum a sufficient quantity of electricity for its increased electricity needs. The rate specified in the Primary Service Contract was the Schedule 35 rate.

¶8 In April 1997, the Commission adopted Resolution 4626 and delegated the power to execute Schedule 50 contracts to the PUD's general manager. The general manager entered into four- and five-year Schedule 50 contracts with several large commercial customers.

¶9 In May 1997, Spectrum and the PUD agreed to a Schedule 50 Power Sales Contract (Schedule 50 Contract). Spectrum decided to enter into a four-year rather than a five-year Schedule 50 Contract. The Schedule 50 Contract term was from January 1, 1997, through December 31, 2000, and superseded the December 1996 Primary Service Contract. The rates and discounts for each year of the Schedule 50 Contract were set forth in Exhibit A. The discounts listed in Exhibit A to Spectrum's Schedule 50 Contract were nine percent for the first year, seven percent for the second year, just under four percent for the third year, and one-half of one percent for the fourth year.[6] Exhibit A specifically states that the rates for the term of

---

[4] CP at 80.

[5] CP at 34.

[6] Based on information in the record regarding discounts offered to other PUD customers in their Schedule 50 contracts, if Spectrum agreed to a fifth year, the percentage adjustment would likely have been a negative number for the fifth year. *See* CP at 86-88.

the contract were fixed rates. "The rates used for the term of this contract for the calculation of the bill prior to applying the percentage reduction will be the rates in effect as of January 1, 1997."[7] Spectrum negotiated with the PUD to include in its Schedule 50 Contract a provision giving Spectrum the option to return to Rate Schedule 35 when the four-year Schedule 50 Contract expired.

*SERVICE FOLLOWING CONTRACT TERM.*

Upon the expiration of the Term or earlier termination of this Contract for any reason, the Customer may, upon reasonable *advance notice to the District,* commence taking service under the District's Rate Schedule 35, or if the Rate Schedule 35 is not available, any retail tariff of the District which is a successor to Rate Schedule 35; *provided, further,* that the Customer acknowledges and agrees that such service may be conditioned on payment by the Customer of any specific costs (which costs the District and the Customer hereby agree are not intended to constitute an exit fee) incurred by the District in acquiring any additional capacity to provide such service.[8]

¶10 In 2000, as the end of Spectrum's Schedule 50 Contract approached, Spectrum began negotiations with the PUD for another service contract. Because of the possibility the PUD would offer another long-term arrangement when the five-year Schedule 50 customers' contracts expired, the PUD wanted a one-year "bridge contract" with Spectrum.

¶11 Spectrum's Chief Executive Officer Charles "Shorty" Seel, Vice President and Treasurer Forrest Hunt, and Plant Engineer David Lawrence Grega met with Garth Williams, the PUD representative, at least four times in 2000 to negotiate a contract for 2001. Spectrum wanted to resume service under Schedule 35 because it offered the best rate, as compared to the PUD's other retail rate schedules. Williams told Spectrum the Schedule 35 rate would increase sometime in 2001 and estimated the increase would

---

[7] CP at 57.

[8] CP at 47.

be approximately three percent. Sometime in May 2000,[9] Spectrum and Williams executed the Power Sales Bridge Contract (Bridge Contract) for January 1, 2001, through December 31, 2001.

¶12 The rates for the Bridge Contract were based on Schedule 35. The April 1999 version of Schedule 35 was attached and incorporated in the Bridge Contract. The Bridge Contract states, "The Customer agrees that the service provided by the District under this Contract is subject to the terms, conditions, and obligations contained in the District's Electric Rate Schedules 35 and 82 and in District's Customer Service Regulations."[10]

¶13 In December 2000, the PUD sent notice to its customers that 2001 energy rates for Schedule 35 would increase more than anticipated. At a December 2000 meeting, the Commission authorized a January 1, 2001 rate increase for all rate schedules, including Schedule 35, sufficient to achieve a 35 percent increase in retail revenue.

¶14 In February 2001, the PUD billed Spectrum for its January 2001 electricity usage according to the new Schedule 35 rate. On February 22, 2001, Spectrum complained that the PUD over-billed it by charging a different, higher rate than the rate agreed to in the Bridge Contract. The PUD disagreed with Spectrum's interpretation of the Bridge Contract. Spectrum paid the invoice amounts for January through December 2001, but disputed $489,425.76.

¶15 In June 2002, Spectrum filed a lawsuit against the PUD. Spectrum alleged the PUD breached the terms of the Bridge Contract. In the alternative, Spectrum claimed the doctrine of promissory estoppel precluded the PUD from

---

[9] The only evidence in the record about when the Bridge Contract was signed is Williams' deposition testimony that he thought it was signed between May 18 and 31, 2000. *See* CP at 126. Hunt's and Williams' signatures on the Bridge Contract are undated, but the Contract says, "the Parties have executed this Contract as of the date first above written." CP at 103. The first page of the Bridge Contract says the contract, "is made and entered into as of the first day of January, 2001." CP at 90.

[10] CP at 95.

raising Spectrum's rates in 2001. The PUD filed a motion for summary judgment arguing the Bridge Contract did not provide a fixed rate, Williams did not have authority to enter into a fixed-rate contract with Spectrum, and Spectrum was not entitled to rely on estoppel.[11] The trial court granted the PUD's motion for summary judgment and dismissed Spectrum's breach of contract and estoppel claims. Spectrum appeals.

## ANALYSIS

¶16 On review of summary judgment, this court engages in the same inquiry as the trial court. *Reynolds v. Hicks*, 134 Wn.2d 491, 495, 951 P.2d 761 (1998). Summary judgment is properly granted when the pleadings and affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The moving party bears the burden of showing there is no genuine dispute as to any material fact. *Green v. A.P.C.*, 136 Wn.2d 87, 100, 960 P.2d 912 (1998). The court must view the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Right-Price Recreation, L.L.C. v. Connells Prairie Cmty. Council*, 146 Wn.2d 370, 381, 46 P.3d 789 (2002). Only when reasonable minds could reach but one conclusion on the evidence should the court grant summary judgment. *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 485, 78 P.3d 1274 (2003).

*Breach of Contract*

¶17 Spectrum argues there are material issues of fact regarding whether the rate in the Bridge Contract was fixed or subject to change.

■■ ¶18 A court's purpose in interpreting a written contract is to ascertain the parties' intent. *U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 569, 919 P.2d 594

---

[11] In the alternative, the PUD argued the contract was ultra vires, illegal, and void because the Commission did not approve a fixed Schedule 35 rate at an open public meeting, a fixed Schedule 35 rate would not cover the PUD's costs, and such a rate would be discriminatory.

(1996). To aid in ascertaining the contracting parties' intent, the court adopted the "context rule" in *Berg v. Hudesman*, 115 Wn.2d 657, 667, 801 P.2d 222 (1990). *See also Diaz v. Nat'l Car Rental Sys., Inc.*, 143 Wn.2d 57, 66, 17 P.3d 603 (2001). Under the context rule, extrinsic evidence is admissible to assist the court in ascertaining the parties' intent and in interpreting the contract. *Williams*, 129 Wn.2d at 569. The court may consider (1) the subject matter and objective of the contract, (2) the circumstances surrounding the making of the contract, (3) the subsequent conduct of the parties to the contract, (4) the reasonableness of the parties' respective interpretations, (5) statements made by the parties in preliminary negotiations, (6) usages of trade, and (7) the course of dealing between the parties. *Berg*, 115 Wn.2d at 666-68. Such evidence is admissible regardless of whether the contract language is deemed ambiguous. *Id.* Extrinsic evidence cannot be considered (a) to show a party's unilateral or subjective intent as to the meaning of a contract word or term; (b) to show an intention independent of the instrument; or (c) to vary, contradict, or modify the written word. *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695, 974 P.2d 836 (1999). "Extrinsic evidence is to be used to illuminate what was written, not what was intended to be written." *Hollis*, 137 Wn.2d at 697. "Unilateral or subjective purposes and intentions about the meanings of what is written do not constitute evidence of the parties' intentions." *Lynott v. Nat'l Union Fire Ins. Co.*, 123 Wn.2d 678, 684, 871 P.2d 146 (1994).

¶19 Interpreting a contract provision is a question of law when (1) the interpretation does not depend on the use of extrinsic evidence or (2) only one reasonable inference can be drawn from the extrinsic evidence. *Tanner Elec. Coop. v. Puget Sound Power & Light Co.*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996). When a court uses extrinsic evidence to interpret a contract, summary judgment is appropriate if only one reasonable meaning can be drawn from the extrinsic evidence. *Scott Galvanizing, Inc. v. Nw. EnviroServs., Inc.*, 120 Wn.2d 573, 582, 844 P.2d 428

(1993); *Interstate Prod. Credit Ass'n v. MacHugh*, 90 Wn. App. 650, 654, 953 P.2d 812 (1998).

■■ ¶20 Spectrum relies on the rate provision in the Bridge Contract to argue the Contract was based on a fixed rate. The Bridge Contract provides:

> *Rates Payable.* In consideration for the products and services furnished by the District to the Customer under this Contract, the Customer agrees to pay to the District the rates and charges set forth in Exhibit A (collectively, the "Rates"). In the event that the Customer purchases any amounts of Electric Power greater than [9,524 kilowatts], the District will provide such additional power at the rate specified in the District's then current Rate Schedule 35.[12]

The copy of Schedule 35 attached to the Bridge Contract as Exhibit A is the version of Schedule 35 that was in effect as of April 1999. There is no dispute that the Schedule 35 in effect as of April 1999, was subject to change.

¶21 Spectrum argues that because the Bridge Contract provides that the rate for excess electricity usage is the "then current" Schedule 35 rate, the rate for standard usage is the specific rate contained in the April 1999 version of Schedule 35, which was attached as Exhibit A, and it could not be changed. In support of this argument, Spectrum relies on the separate sentences in the "Rates Payable" provision of the Bridge Contract that address the rate for standard and excess usage. Spectrum claims the trial court's conclusion that the same Schedule 35 rate applied to both standard and excess purchases is unreasonable and renders the clause regarding excess energy usage meaningless. Courts may not adopt a contract interpretation that renders a term absurd or meaningless. *Seattle-First Nat'l Bank v. Westlake Park Assocs.*, 42 Wn. App. 269, 270, 274, 711 P.2d 361 (1985) (concluding that construing contract term allowing lease termination if leased property is taken by "process of law, proceedings in bankruptcy, insolvency, receivership or other involuntary method," as restricted to

---

[12] CP at 92.

enumerated measures, renders general "or other involuntary method" language meaningless). Unlike an interpretation that makes it impossible to give two contract terms effect, here, both the standard and excess rate terms can be given effect even if they name the same rate.

¶22 Spectrum contends the parties to the Bridge Contract would not have separately addressed the rates for standard and excess usage if they did not intend to establish different rates for different usage levels. But there is no evidence in the record that the parties negotiated different rates for standard and excess usage or that the PUD agreed to a fixed rate in the Bridge Contract.[13]

¶23 Spectrum also argues its Primary Service Contract and Schedule 50 Contract provide extrinsic evidence about course of dealing that confirms the PUD and Spectrum intended to include a fixed rate in the Bridge Contract.[14] The 1996 Primary Service Contract contained a provision that explicitly states the Schedule 35 rate is subject to change. The Schedule 50 Contract explicitly applies the rate in effect as of a certain date. Spectrum claims that when the Bridge Contract is compared to these provisions in the Primary Service Contract and the Schedule 50 Contract, it is clear the parties intended a fixed rate in the Bridge Contract. Neither comparison supports Spectrum's position.

---

[13] And Spectrum cites no authority to support its implicit assertion that the standard and excess rate terms must be interpreted as establishing different rates. This court need not address arguments that are not supported by citation to authority. RAP 10.3(a)(5); *see also Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

[14] Spectrum also argues that the PUD's "treatment of Spectrum" during the years leading up to the Bridge Contract shows the parties' intent to use a fixed rate in the Bridge Contract. Appellant's Br. at 27. But the fact that the PUD negotiated a one-year contract to bridge the time between Spectrum's Schedule 50 Contract and when the five-year Schedule 50 contracts would end has no bearing on whether the PUD intended a fixed rate in Spectrum's Bridge Contract. The Schedule 50 Contract was for a limited term, and Spectrum chose a four-year term instead of five so that it would have an opportunity to take advantage of rates that might be lower in four years. The Schedule 50 Contract gave Spectrum the right to return to the otherwise-closed Schedule 35, but it said nothing about future fixed rates.

¶24 The 1996 Primary Service Contract incorporated the then-current Rate Schedule 35, and the contract explicitly stated the rates in Schedule 35 are subject to change.

Purchaser agrees to pay each month to the District for the electric power delivered to the Purchaser at the rate or rates set forth in Schedule Nos. 35 and 82 of the District's Electric Rate Schedules, or their successors, and such other of the District's Electric Rate Schedules as may be applicable to Purchaser. *Schedules are subject to modification by resolution of the Commissioners of the District.* In the event a Schedule applicable to Purchaser is revised by the Commission, the Purchaser agrees to thereafter pay for electric power delivered pursuant to this Agreement in accordance with the revised schedule.[15]

Even though the Bridge Contract did not contain a similar provision, it is uncontroverted that Spectrum received service under Schedule 35 for more than 10 years before executing the Primary Service Contract and knew the rates in Schedule 35 had changed in the past and were subject to change in the future.

¶25 Comparing the Bridge Contract to the Schedule 50 Contract also supports the conclusion that the Bridge Contract does not contain a fixed rate. It is undisputed that the Schedule 50 Contract has a fixed rate. The Schedule 50 Contract provides, "The rates used for the term of this contract for the calculation of the bill . . . will be the rates in effect as of January 1, 1997."[16] The Bridge Contract does not contain any comparable language. Exhibit A to the Bridge Contract incorporates the version of Schedule 35 that was in effect when the Bridge Contract was executed in May 2000. There is no language in the Bridge Contract that the rates used for the term of the contract are the rates in effect as of a specific date, and there is no other indication in the Bridge Contract that the parties intended a fixed rate

---

[15] CP at 34 (emphasis added).

[16] CP at 57.

like the one in the Schedule 50 Contract.[17] In addition, the unique circumstances of the Schedule 50 contract supports the conclusion that a fixed rate was not set in the Bridge Contract. Under Schedule 50, the PUD could offer fixed rates to its Schedule 50 customers because it was able to make bulk purchases.[18]

¶26 Spectrum also contends the Bridge Contract negotiations support interpreting the Bridge Contract as establishing a fixed rate.[19] Spectrum relies on the testimony of Spectrum representative David Grega and PUD representative Garth Williams. Grega testified that he told Williams the rate in the Bridge Contract "could not be variable."[20] But Grega also testified that Williams did not respond to his statement that the rate could not be variable other than to say, "I'll get back to you."[21] Spectrum also relies on Grega's testimony that he believed Williams' statements during negotiations meant the Bridge Contract rate was fixed and would apply throughout the term of the Bridge Contract. But Grega's unilateral or subjective intent regarding the meaning of Williams' statements during negotiations and the Bridge Contract rate term cannot be considered to show Spectrum's intent. *Hollis*, 137 Wn.2d at 695.

¶27 Spectrum also relies on Williams' testimony that he did not explicitly "tell any Spectrum representative that

---

[17] In its reply brief, Spectrum contends that the Bridge Contract "attaches rates of a specific date, April 1999." Reply Br. at 4. But April 1, 1999, is the effective date of the version of the Schedule 35 that is attached to the Bridge Contract. There is no statement in the Bridge Contract that the rates used for the term of the contract are the rates in effect as of that date.

[18] And based on the record, Schedule 50 is the only rate that was not subject to change.

[19] Spectrum also argues the PUD failed to provide any evidence that the parties intended the Bridge Contract to contain an adjustable rate but instead relied solely on argument by counsel. But while some of the PUD's arguments at the summary judgment hearing may not have been supported by evidence in the record, the PUD presented evidence in support of its motion for summary judgment that the Bridge Contract Spectrum executed referred to Schedule 35 for the rate under the contract, and that Spectrum knew Schedule 35 rates were subject to change.

[20] CP at 141.

[21] CP at 141.

Spectrum's rate for the term of the bridge contract would be the then existing Schedule 35 rate."[22] Spectrum claims Williams also told Spectrum that the Bridge Contract rate would increase by three percent at most above the rate charged in the Schedule 50 Contract. But Williams' failure to say the rate under the Bridge Contract would be the "then existing" Schedule 35 rate is not evidence of an intent to set a fixed rate. And the record does not support Spectrum's claim that Williams said the rate in the Bridge Contract would be only three percent higher than the rate in the Schedule 50 Contract. Instead, according to Williams' deposition testimony, he told Spectrum the Schedule 35 rate was expected to increase three percent over the term of the Bridge Contract, and the Schedule 35 rate would start out slightly higher than the rate Spectrum paid in the last year of its Schedule 50 Contract.[23]

¶28 Finally, Spectrum argues *Scott Paper Co. v. City of Anacortes*, 90 Wn.2d 19, 578 P.2d 1292 (1978), and *City of Tacoma, Department of Public Utilities v. United States*, 31 F.3d 1130 (1994), support its interpretation that the Bridge Contract contains a fixed rate. Both cases are inapposite. In *Scott Paper Co.*, the City agreed to specific rates for water service in a contract. The court held the City could not impose new rates in an ordinance that was not retroactive and did not apply to contracts executed before the ordinance's effective date. *Scott Paper Co.*, 90 Wn.2d at 26-27. Here, unlike *Scott Paper Co.*, the Bridge Contract incorporates a rate schedule as the contract rate, and the schedule was subject to change when the contracts that included the schedule were executed. In *City of Tacoma*, the City entered into a contract to supply electrical services to McChord Air Force Base based on a rate contained in one of the City's rate schedules. But because the contract also included a rate change provision for the City to negotiate rate changes, the City was not allowed to impose new rates without

---

[22] CP at 127.

[23] Williams' testimony supports the conclusion that the Schedule 35 rate would change and was not a fixed rate.

complying with the rate change provision and negotiating a rate change. *City of Tacoma*, 31 F.3d at 1132-33. Unlike *City of Tacoma*, the Bridge Contract does not contain a rate change provision that the PUD must follow in order to change rates.

¶29 The only reasonable inference is that while Spectrum told the PUD it wanted a fixed rate for the Bridge Contract, the PUD did not agree to a fixed rate. The Bridge Contract incorporates Schedule 35, and Schedule 35 is subject to change. We affirm the trial court's decision to dismiss Spectrum's breach of contract claim on summary judgment.[24]

*Promissory Estoppel*

■ ¶30 Spectrum argues the trial court erred in dismissing its promissory estoppel claim on summary judgment because there are material issues of fact.[25] But the doctrine of promissory estoppel does not apply where a contract governs. *Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 261 n.4, 616 P.2d 644 (1980). Here, the Bridge Contract governs the applicable rate for the electricity Spectrum used in 2001.

---

[24] Because we agree that the rate in the Bridge Contract was subject to change, we need not address the PUD's alternative arguments regarding the Open Public Meetings Act of 1971, chapter 42.30 RCW; the legality of a fixed-rate contract other than under Schedule 50; rate discrimination; and Williams' authority to execute a fixed-rate contract.

[25] As a preliminary issue, Spectrum contends the trial court erred by dismissing Spectrum's claim under a theory of promissory estoppel because the PUD moved for summary judgment on an "equitable estoppel" claim. *See* CP at 299-300. Spectrum contends the promissory estoppel claim was not properly before the trial court. But Spectrum addressed its promissory estoppel claim in its summary judgment response, the PUD addressed it in its summary judgment reply, and both parties argued the proper claim to the trial court at the summary judgment hearing. The parties and the trial court had an opportunity to address this issue on summary judgment, and it is properly raised on appeal. *See* RAP 2.5(a); *Sorrel v. Eagle Healthcare, Inc.*, 110 Wn. App. 290, 38 P.3d 1024 (2002).

Spectrum also contends the court's dismissal of its promissory estoppel claim should be reversed because the court did not provide reasoning for its decision. But this court's review on summary judgment is de novo and we may affirm a trial court's decision on summary judgment on any basis supported by the record. *Int'l Bhd. of Elec. Workers, Local Union No. 46 v. Trig Elec. Constr. Co.*, 142 Wn.2d 431, 434-35, 13 P.3d 622 (2000).

¶31 In addition, promissory estoppel requires a promise. *Klinke*, 94 Wn.2d at 259. Spectrum contends the Bridge Contract and Williams' testimony are evidence of a promise. But the record does not support Spectrum's contention. As discussed, the Bridge Contract contained a rate that was subject to change, not a fixed rate. And contrary to Spectrum's contention, Williams did not promise the Bridge Contract rate would increase by only three percent from the Schedule 50 Contract. Instead, he told Spectrum that the rate for the Bridge Contract would be higher than their rate under the Schedule 50 Contract and the Schedule 35 rate was predicted to increase by approximately three percent during the term of the Bridge Contract. Spectrum's promissory estoppel claim fails as a matter of law.

## CONCLUSION

¶32 The only reasonable inference that can be drawn from the extrinsic evidence in this case is that the rate in the Bridge Contract was subject to change. Because the applicable rate was set by contract, Spectrum's promissory estoppel claim fails as a matter of law. We affirm the trial court's dismissal of Spectrum's claims for breach of contract and promissory estoppel.

AGID and APPELWICK, JJ., concur.