**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WASHINGTON STATE REPUBLICAN
PARTY, STEVE NEIGHBORS; MARCY
COLLINS; WILLIAM MICHAEL YOUNG;
DIANE TEBELIUS, BERTABELLE
HUBKA; MIKE GASTON,
                            *Plaintiffs,*

LIBERTARIAN PARTY OF WASHINGTON
STATE; RUTH BENNETT, J. S. MILLS,
            *Intervenor-Plaintiffs,*

and

WASHINGTON STATE DEMOCRATIC
CENTRAL COMMITTEE,
        *Intervenor-Plaintiff-Appellant,*

v.

WASHINGTON STATE GRANGE; SAM
REED, Secretary of State; STATE OF
WASHINGTON; ROB MCKENNA,
    *Intervenor-Defendants-Appellees.*

No. 11-35122

D.C. No.
2:05-cv-00927-JCC

WASHINGTON STATE REPUBLICAN PARTY,

*Plaintiff-Appellant,*

and

WASHINGTON STATE DEMOCRATIC CENTRAL COMMITTEE; LIBERTARIAN PARTY OF WASHINGTON STATE; RUTH BENNETT; J. S. MILLS,

*Intervenor-Plaintiffs,*

v.

WASHINGTON STATE GRANGE; STATE OF WASHINGTON; ROB MCKENNA; SAM REED, Secretary of State,

*Intervenor-Defendants-Appellees.*

No. 11-35124

D.C. No.
2:05-cv-00927-JCC

WASHINGTON STATE REPUBLICAN
PARTY,

*Plaintiff,*

WASHINGTON STATE DEMOCRATIC
CENTRAL COMMITTEE,

*Intervenor-Plaintiff,*

and

LIBERTARIAN PARTY OF WASHINGTON
STATE; RUTH BENNETT; J. S. MILLS,
*Intervenor-Plaintiffs-Appellants,*

v.

WASHINGTON STATE GRANGE;
STATE OF WASHINGTON; ROB
MCKENNA; SAM REED, Secretary of
State,
*Intervenor-Defendants-Appellees.*

No. 11-35125

D.C. No.
2:05-cv-00927-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
November 29, 2011—Pasadena, California

Filed January 19, 2012

Before: Dorothy W. Nelson, Raymond C. Fisher and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Fisher

## COUNSEL

David T. McDonald (argued for all appellants), Emily D. Throop, Peter A. Talevich and Jennifer S. Addis, K&L Gates

LLP, Seattle, Washington, for appellant Washington State Democratic Central Committee.

John J. White, Jr., and Kevin B. Hansen, Livengood, Fitzgerald & Alskog, PLLC, Kirkland, Washington, for appellant Washington State Republican Party.

Orrin Leigh Grover, Woodburn, Oregon, for appellants Libertarian Party of Washington State, Ruth Bennett and John S. Mills.

Robert M. McKenna, Attorney General; James K. Pharris, Jeffrey T. Even (argued) and Allyson Zipp, Deputy Solicitors General, Olympia, Washington, for appellees State of Washington, Rob McKenna and Sam Reed.

Thomas F. Ahearne (argued) and Kathryn Carder McCoy, Foster Pepper PLLC, Seattle, Washington, for appellee Washington State Grange.

## OPINION

FISHER, Circuit Judge:

We address whether the State of Washington has designed its election ballots in a manner that eliminates the risk of widespread voter confusion, a question left unresolved in *Washington State Grange v. Washington State Republican Party* ("*Grange*"), 552 U.S. 442 (2008). We hold that the state has done so. The ballots, and related informational materials, inform voters that, although each candidate for partisan office may specify a political party that he or she prefers, a candidate's preference does not imply that the candidate is nominated or endorsed by the party, or that the party approves of or associates with that candidate. Given the design of the ballot, and in the absence of evidence of actual voter confusion,

we hold that Washington's top two primary system, as implemented by the state, does not violate the First Amendment associational rights of the state's political parties, the appellants here. We also affirm the district court's dismissal of the plaintiffs' ballot access and trademark claims. We reverse the district court's order granting the state's request for reimbursement of attorney's fees paid in accordance with a 2006 stipulation.

## I.  Background

In 2003, this court invalidated Washington's blanket primary as a violation of political parties' First Amendment freedom of association. *See Democratic Party of Wash. State v. Reed*, 343 F.3d 1198, 1201 (9th Cir. 2003). In response to that decision, the Washington State Grange proposed the People's Choice Initiative of 2004, or Initiative 872 (I-872), as a replacement. *See Grange*, 552 U.S. at 446-47. The initiative passed with nearly 60 percent of the vote and became effective in December 2004. *See id.* at 447.

I-872 created a "top two" primary, in which the primary serves as a means of winnowing the candidates to two rather than selecting party nominees. "Under I-872, all elections for 'partisan offices' are conducted in two stages: a primary and a general election." *Id.* (footnote omitted).[1] "To participate in the primary, a candidate must file a 'declaration of candidacy' form, on which he declares his 'major or minor party preference, or independent status.' " *Id.* (quoting former Wash. Rev.

---

[1]A "partisan office" is "a public office for which a candidate may indicate a political party preference on his or her declaration of candidacy and have that preference appear on the primary and general election ballot in conjunction with his or her name." Wash. Rev. Code § 29A.04.110. Partisan offices include U.S. senator and U.S. representative, all state offices, including legislative offices, except judicial offices and the office of superintendent of public instruction, and all county offices except judicial offices and those offices for which a county home rule charter provides otherwise. *See id.*

Code § 29A.24.030, superseded in part by Wash. Rev. Code § 29A.24.031). "Each candidate and his party preference (or independent status) is in turn designated on the primary election ballot," and "[a] political party cannot prevent a candidate who is unaffiliated with, or even repugnant to, the party from designating it as his party of preference." *Id.* (citing former Wash. Admin. Code § 434-215-015). "In the primary election, voters may select 'any candidate listed on the ballot, regardless of the party preference of the candidates or the voter.' " *Id.* (quoting former Wash. Admin. Code § 434-262-012). "The candidates with the highest and second-highest vote totals advance to the general election, regardless of their party preferences." *Id.* at 447-48. "Each candidate's party preference is listed on the general election ballot, and may not be changed between the primary and general elections." *Id.* at 448 (citing former Wash. Admin. Code § 434-230-040).

In May 2005, the Washington State Republican Party filed suit against the state, challenging I-872 on its face. *See id.* "The party contended that the new system violates its associational rights by usurping its right to nominate its own candidates and by forcing it to associate with candidates it does not endorse." *Id.* The Washington State Democratic Central Committee and Libertarian Party of Washington State joined the suit as plaintiffs, and the Washington State Grange joined as a defendant. *See id.* The district court granted the plaintiffs' motions for summary judgment and enjoined the implementation of I-872, *see Wash. State Republican Party v. Logan*, 377 F. Supp. 2d 907, 932 (W.D. Wash. 2005), and this court affirmed, *see Wash. State Republican Party v. Washington*, 460 F.3d 1108, 1125 (9th Cir. 2006). In a separate order, we also awarded attorney's fees on appeal to the plaintiffs and against the state under 42 U.S.C. § 1988.

The Supreme Court reversed. The Court began by reciting the general principle that "[e]lection regulations that impose a severe burden on associational rights are subject to strict scrutiny," and will be upheld "only if they are 'narrowly tai-

lored to serve a compelling state interest.' " *Grange*, 552 U.S. at 451 (quoting *Clingman v. Beaver*, 544 U.S. 581, 586 (2005)). "If a statute imposes only modest burdens, however, then 'the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions' on election procedures." *Id.* at 452 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).

The Court next determined that I-872 did not on its face severely burden the plaintiffs' associational rights. First, the Court rejected the plaintiffs' argument that I-872 allows primary voters who are unaffiliated with a party to choose the party's nominees. *See id.* at 452-53. The flaw in the parties' argument was that "the I-872 primary does not, by its terms, choose parties' nominees" — the parties are free to "nominate their own candidates outside the state-run primary . . . by whatever mechanism they choose." *Id.* at 453.

Second, and relevant here, the Court considered the plaintiffs' argument that I-872 "burdens their associational rights because voters will assume that candidates on the general election ballot are the nominees of their preferred parties." *Id.* at 454.[2] Rejecting this argument, the Court said there was "no basis to presume that a well-informed electorate w[ould] interpret a candidate's party-preference designation to mean that the candidate is the party's chosen nominee or representa-

---

[2]The Court summarized the plaintiffs' claims as follows:

> At bottom, respondents' objection to I-872 is that voters will be confused by candidates' party-preference designations. Respondents' arguments are largely variations on this theme. Thus, they argue that even if voters do not assume that candidates on the general election ballot are the nominees of their parties, they will at least assume that the parties associate with, and approve of, them. This, they say, compels them to associate with candidates they do not endorse, alters the messages they wish to convey, and forces them to engage in counterspeech to disassociate themselves from the candidates and their positions on the issues.

*Grange*, 552 U.S. at 454.

tive or that the party associates with or approves of the candidate." *Id.* The Court recognized that it was "*possible* that voters w[ould] misinterpret the candidates' party-preference designations as reflecting endorsement by the parties. But these cases involve a facial challenge, and we cannot strike down I-872 on its face based on the mere possibility of voter confusion." *Id.* at 455.

Because the Court was considering a facial challenge, the question was "whether the ballot could conceivably be printed in such a way as to eliminate the possibility of widespread voter confusion and with it the perceived threat to the First Amendment." *Id.* at 456. The Court said it was "not difficult to conceive of such a ballot." *Id.*

> For example, petitioners propose that the actual I-872 ballot could include prominent disclaimers explaining that party preference reflects only the self-designation of the candidate and not an official endorsement by the party. They also suggest that the ballots might note preference in the form of a candidate statement that emphasizes the candidate's personal determination rather than the party's acceptance of the candidate, such as "my party preference is the Republican Party." Additionally, the State could decide to educate the public about the new primary ballots through advertising or explanatory materials mailed to voters along with their ballots. We are satisfied that there are a variety of ways in which the State could implement I-872 that would eliminate any real threat of voter confusion. And without the specter of widespread voter confusion, respondents' arguments about forced association and compelled speech fall flat.

*Id.* at 456-57 (footnotes omitted). In the Court's view, "these implementations of I-872 would be consistent with the First Amendment." *Id.* at 457.

Given that I-872 did not on its face severely burden the plaintiffs' associational rights, strict scrutiny did not apply and the state had to demonstrate only that I-872 furthered important regulatory interests. The Court held this lesser scrutiny was satisfied because I-872 served the state's important regulatory interest in "providing voters with relevant information about the candidates on the ballot." *Id.* at 458. The Court remanded, however, allowing the plaintiffs to challenge I-872 as applied. Anticipating that challenge, the Court said that "whether voters will be confused by the party-preference designations will depend in significant part on the form of the ballot." *Id.* at 455.

The state subsequently implemented I-872 in a manner consistent with the Supreme Court's suggestions. *First*, each primary and general election ballot includes a disclaimer informing voters of the absence of an association between the candidate and the preferred party. This disclaimer states:

> READ: Each candidate for partisan office may state a political party that he or she prefers. A candidate's preference does not imply that the candidate is nominated or endorsed by the party, or that the party approves of or associates with that candidate.

Wash. Admin. Code § 434-230-015(4)(a). *Second*, the ballots denote a candidate's party preference in the form of a candidate statement that emphasizes the candidate's personal choice rather than the party's acceptance of the candidate. Rather than designating a candidate's party preference with a simple "D" or "R," or with the words "Democrat" or "Republican," under each candidate's name the ballots contain a parenthetical such as "(Prefers Democratic Party)" or "(Prefers Republican Party)." *Third*, the state requires explanatory materials to be mailed to voters.[3] Every voter receives a "Vot-

---

[3] Over 90 percent of Washington voters vote by mail. *See Grange*, 552 U.S. at 456 n.8.

ers' Pamphlet" before each primary and general election. The pamphlet includes "an explanation that each candidate for partisan office may state a political party that he or she prefers, and that a candidate's preference does not imply that the candidate is nominated or endorsed by the party or that the party approves of or associates with that candidate." Wash. Admin. Code § 434-381-200. Voters also receive along with their ballots an insert stating:

> Each candidate for partisan office may state a political party that he or she prefers. A candidate's preference does not imply that the candidate is nominated or endorsed by the party, or that the party approves of or associates with that candidate.

*Id.* § 434-250-040(1)(j)-(k). *Fourth*, the state disseminated educational information to the public about the new ballots before the 2008 primary by airing public service announcements on radio and television.

In the district court on remand, the plaintiffs argued that I-872, as implemented by the state, violated their First Amendment associational rights. They contended that strict scrutiny applied because the state had failed to show that its implementation of I-872 eliminated the risk of widespread voter confusion. They faulted the state for failing to present affirmative evidence to show that the ballot disclaimer and related voter information were read and understood by voters, or that these materials were effective at eliminating the risk of confusion. They also offered evidence purporting to show actual voter confusion regarding the I-872 ballot.

On cross motions for summary judgment, the district court granted the defendants' motions on the plaintiffs' as-applied associational rights claims. The court emphasized that the state had implemented I-872 in accordance with the Supreme Court's suggestions, and that the plaintiffs' evidence of actual voter confusion was either legally irrelevant or factually

insufficient to create a triable issue of widespread voter confusion.

The district court also disposed of the remaining issues in the case. The court granted summary judgment to the plaintiffs on their claim that the manner in which the state provided for the election of local party officials — precinct committee officers, or PCOs — violated the parties' associational rights. The court granted the defendants' motions to dismiss the plaintiffs' ballot access and trademark claims, denied the plaintiffs leave to amend their complaints to add a claim under the Washington Constitution and granted the state's motion for reimbursement of the attorney's fees it paid in connection with the previous Ninth Circuit appeal.

The plaintiffs timely appealed. The defendants did not cross appeal the court's ruling on the PCO elections. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part and reverse in part.

## II.  Discussion

### A.  Freedom of Association Claims

The district court granted the defendants summary judgment on the plaintiffs' claims that I-872 violates their First Amendment associational rights as applied. Reviewing de novo, *see Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1047 (9th Cir. 2010), we affirm.

[1] To trigger strict scrutiny, the plaintiffs must show that the state's implementation of I-872 severely burdens their freedom of association.[4] To do so, they must show that "a

---

[4]The plaintiffs dispute this proposition, arguing that the burden was on the state to prove that its implementation of I-872 eliminates any risk of voter confusion. We disagree. Under the First Amendment, plaintiffs bear the initial burden of demonstrating that a challenged election regulation

well-informed electorate will interpret a candidate's party-preference designation to mean that the candidate is the party's chosen nominee or representative or that the party associates with or approves of the candidate." *Grange*, 552 U.S. at 454. This inquiry "depend[s] in significant part on the form of the ballot." *Id.* at 455.

### 1. Form of the Ballot

**[2]** The "form of the ballot" plainly supports the conclusion that I-872 does not impose a severe burden on the plaintiffs' freedom of association. As described above, the state in implementing the ballot adopted each of the Supreme Court's suggestions. *See Grange*, 552 U.S. at 456. The ballot includes a prominent disclaimer explaining that party preference reflects only the self-designation of the candidate and not an endorsement by the party. The ballot describes a candidate's party preference as "(Prefers Republican Party)" rather than as "R," "Republican" or "Republican Party." Voters' Pamphlets and ballot inserts also inform voters that party preference reflects only a candidate's self-designation. The form of the ballot thus points to an absence of voter confusion.

### 2. Evidence of Actual Voter Confusion

The plaintiffs attempt to rebut this inference with evidence of actual voter confusion. This purported evidence falls into four categories, which we address in turn. As did the district

---

severely burdens their First Amendment rights. *See Prete v. Bradbury*, 438 F.3d 949, 951 & 953 n.5 (9th Cir. 2006). The burden then falls on the state to demonstrate either that the regulation is narrowly tailored to achieve a compelling state interest or, if the regulation imposes only a modest burden on First Amendments rights, that the regulation furthers the state's important regulatory interests. *See id.* at 961. Here, it was the plaintiffs' burden to demonstrate the existence of widespread voter confusion, not the defendants' burden to demonstrate its absence.

court, we find this evidence insufficient to create a triable issue of widespread voter confusion.

[3] First, the plaintiffs rely on newspaper articles in which the news media and elected officials refer to candidates as "Democrats" or "Republicans" when they are not official party nominees or representatives but have simply declared a preference for the Democratic or Republican Party. Such statements do not establish that members of the media or elected officials are confused about these candidates' party affiliations, however. The speakers in these examples may simply be "using shorthand" to indicate the party preference the candidate listed on his or her declaration of candidacy. As the district court explained, these "isolated incidents do not show the type of widespread voter confusion the Supreme Court contemplated in its review."

[4] Second, the plaintiffs introduced a study of voter confusion by Mathew Manweller, a professor of political science. Manweller conducted cognitive experiments to determine whether voters are likely to perceive candidates listed on the I-872 primary and general election ballots as nominees or representatives of the political parties the candidates have declared as their preference. His results suggest voter confusion, but Manweller did not give the subjects in his experiments the ballot inserts and voter pamphlets the state provides to the actual electorate. The sample ballots Manweller used also did not conform to the ballots used in actual elections: whereas state law requires that the disclaimer regarding the lack of party association appear "immediately above the first partisan congressional, state or county office," Wash. Admin. Code § 434-230-015(4)(a), the ballots used in the study placed the notice on the bottom-left corner, below the first partisan race. Manweller's results therefore are not relevant evidence of whether "a *well-informed electorate* will interpret a candidate's party-preference designation to mean that the candidate is the party's chosen nominee or representative or

that the party associates with or approves of the candidate." *Grange*, 552 U.S. at 454 (emphasis added).

**[5]** Third, the plaintiffs argue that Washington's statutes and regulations create voter confusion over whether political parties associate with or approve of candidates who specify a preference for that party on their declarations of candidacy. The plaintiffs point to two sections of Washington election law that refer to a candidate's statement of party preference as that candidate's "party affiliation." *See* Wash. Rev. Code § 42.17A.205(f)[5]; Wash. Admin. Code § 390-05-274.[6] They contend that, if voters were to read these sections and see that the state equates a candidate's "party preference" with that candidate's "party affiliation," they would come away with the impression that candidates are official representatives of their "preferred" parties. We disagree. In the first place, we find implausible the premise that even well-informed voters are aware of the intricacies of Washington's election regulations. It is highly unlikely that voters would read and rely on §§ 42.17A.205(f) and 390-05-274 to obtain an understanding of I-872. Even if voters were aware of those provisions, we do not find them confusing. There is nothing inherently misleading about equating a candidate's self-declared party preference with party affiliation: a candidate who has declared a preference for a particular political party *has* affiliated with that party. The confusion that is at issue here is whether voters mistakenly believe *the party* has affiliated with the candidate, not vice versa. In light of the clear language of the ballot, the Voters' Pamphlet and the ballot insert, no reasonable voter would be confused by §§ 42.17A.205(f) and 390-05-274.[7]

---

[5] Formerly codified as Washington Revised Code § 42.17.040(f).

[6] The language of these sections may reflect the state's efforts to harmonize I-872's concept of self-declared "party preference" with existing election laws using pre-I-872 terminology.

[7] Section 390-05-274(1), in fact, states: "A candidate's preference does not imply that the candidate is nominated or endorsed by that party, or that the party approves of or associates with that candidate."

**[6]** Fourth, the Democratic Party complains that in several I-872 primary elections its official nominee failed to advance to the general election. It attributes those results to voter confusion, speculating that its nominee failed to finish among the top two votegetters because another self-declared Democrat entered the race and siphoned votes from the official nominee. The plaintiffs offer no evidence, however, that these election results reflect voter confusion rather than voters' actual preferences. The plaintiffs have not, for example, produced surveys of actual voters showing that they voted for a candidate they mistakenly believed to be an official party nominee or representative. That official party nominees have failed to advance does not, without more, suggest voter confusion.

**[7]** In sum, the plaintiffs have not demonstrated a triable issue that the state's implementation of I-872 imposes a severe burden on their freedom of association. The state therefore need show only that I-872 furthers an important regulatory interest. They have done so, because, as the Supreme Court held in *Grange*, I-872 serves the state's important regulatory interest in "providing voters with relevant information about the candidates on the ballot." 552 U.S. at 458. We therefore affirm summary judgment in favor of the defendants on the plaintiffs' as-applied freedom of association claims.

## B. Ballot Access Claims

The Libertarian Party argues that I-872 violates its fundamental right of access to the ballot by making it difficult for a minor-party candidate to qualify for the general election ballot. We review de novo the district court's dismissal of these claims under Federal Rule of Civil Procedure 12(b)(6). *See Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011).

When evaluating the constitutionality of ballot access regulations, we weigh the degree to which the regulations burden the exercise of constitutional rights against the state interests the regulations promote. *See Libertarian Party of Wash. v.*

*Munro*, 31 F.3d 759, 761 (9th Cir. 1994). If the burden is severe, the challenged procedures must be narrowly tailored to achieve a compelling state interest. *See id.* If the burden is slight, the procedures will survive review as long as they further a state's "important regulatory interests." *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)) (internal quotation marks omitted). In determining whether the burden is severe, "[t]he question is whether 'reasonably diligent' minor party candidates can normally gain a place on the ballot, or if instead they only rarely will succeed." *Libertarian Party of Wash.*, 31 F.3d at 762; *accord Nader*, 531 F.3d at 1035.

Here, the Libertarian Party acknowledges that it has broad access to the I-872 primary. To qualify for the primary ballot, a candidate — whether from a major or minor party — need only (1) file a declaration of candidacy and (2) either pay a filing fee equal to 1 percent of the annual salary for the office or submit a signature petition in lieu of the filing fee. *See* Wash. Rev. Code §§ 29A.24.031, 29A.24.091. The Libertarian Party argues, however, that its rights are violated because I-872 makes it difficult for a minor-party candidate to progress to the *general* election ballot. A candidate, whether from a major or minor party, can attain a place in the general election only by finishing in the top two in the primary.

The Libertarian Party relies on cases invalidating early filing deadlines for minor-party and independent candidates seeking access to general election ballots. In *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the Court struck down a statute requiring an independent candidate for president to file a statement of candidacy and nominating petition in March in order to appear on the November general election ballot. The Court held that the early filing deadline placed an unconstitutional burden on voting and associational rights because it prevented independents from taking advantage of unanticipated political opportunities that might arise later in the election cycle and required independent candidates to gather

petition signatures at a time when voters were not attuned to the upcoming campaign. *See Anderson*, 460 U.S. at 786, 790-92.

[8] By giving minor-party candidates access to the August primary ballot rather than the November general election ballot, I-872 poses, albeit to a lesser extent, some of these same concerns. I-872, however, is distinguishable from the ballot access rules invalidated in *Anderson*. First, the I-872 primary is in August, not March. Second, unlike the system challenged in *Anderson*, in which independent candidates were required to file petitions before the major parties selected their nominees, the Libertarian Party participates in a primary at the same time, and on the same terms, as major party candidates. Libertarian Party candidates thus have an opportunity to appeal to voters at a time when election interest is near its peak, and to respond to events in the election cycle just as major party candidates do. In addition, whereas conventional systems guarantee major-party candidates a place on the general election ballot, I-872 gives minor-party candidates the same opportunity as major-party candidates to advance to the general election.

[9] In light of these distinctions, we hold that I-872 does not impose a severe burden on the Libertarian Party's rights. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 199 (1986) ("It can hardly be said that Washington's voters are denied freedom of association because they must channel their expressive activity into a campaign at the primary as opposed to the general election."). The Party has not shown that I-872 impermissibly "limit[s] the field of candidates from which voters might choose." *Anderson*, 460 U.S. at 786 (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)) (internal quotation marks omitted). In addition, because I-872 gives major- and minor-party candidates equal access to the primary and general election ballots, it does not give the "established parties a decided advantage over any new parties struggling for existence." *Williams v. Rhodes*, 393 U.S. 23, 31 (1968).

**[10]** We recognize the possibility that I-872 makes it more difficult for minor-party candidates to qualify for the general election ballot than regulations permitting a minor-party candidate to qualify for a general election ballot by filing a required number of petition signatures. This additional burden, however, is an inherent feature of any top two primary system, and the Supreme Court has expressly approved of top two primary systems. *See Cal. Democratic Party v. Jones*, 530 U.S. 567, 585-86 (2000). The district court therefore properly dismissed these claims.

## C.   Trademark Claims

The Libertarian Party also contends that the state's implementation of I-872 infringes its rights under federal trademark law. We review de novo the district court's Rule 12(b)(6) dismissal of these claims. *See Cook*, 637 F.3d at 1004.

**[11]** To establish a federal trademark infringement claim, the Libertarian Party is required to show that the defendant — here, the State of Washington — uses the Party's registered mark "in connection with the sale, offering for sale, distribution, or advertising of any *goods or services*." 15 U.S.C. § 1114(1)(a) (emphasis added). This "does not require any actual *sale* of goods [or] services." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 679 (9th Cir. 2005). At minimum, however, the plaintiff must show that the defendant "offers *competing* services to the public." *Id.*

**[12]** The Libertarian Party correctly points out that "services" can include activities performed by a political party. *See United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 90 (2d Cir. 1997). But it has not plausibly alleged that the *state* uses party labels on the ballot to perform a service in competition with the Libertarian Party. Nor has it even attempted to make this showing. On the contrary, although the district court focused on this weakness in the Party's case, and although the state presses the same issue in

its brief on appeal, the Party has not explained how the state uses the Party's mark in connection with the provision of competing services. We therefore affirm dismissal of the trademark claims.[8]

## D.   Attorney's Fees

In 2006, after ruling in the plaintiffs' favor on the merits, we issued an order awarding attorney's fees on appeal to the plaintiffs and against the state under 42 U.S.C. § 1988. The parties subsequently entered into a settlement governing the amount and payment of those fees. They reduced their settlement to a written stipulation, which was filed in this court. The Supreme Court thereafter granted certiorari and reversed our decision, and the state then moved for reimbursement of the fees, arguing that the plaintiffs were no longer prevailing parties. The plaintiffs opposed the motion, arguing that the settlement had definitively resolved the fee issue, irrespective of further proceedings. The district court granted the motion, and the plaintiffs appeal. Because this issue turns on a question of contract interpretation, we review de novo. *See Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th Cir. 2009) ("Contract interpretation is a question of law that we review *de novo*.").

Under Washington law, contracts are interpreted in accordance with the context rule. *See Spectrum Glass Co. v. Pub. Util. Dist. No. 1*, 119 P.3d 854, 858 (Wash. Ct. App. 2005). "Under the context rule, extrinsic evidence is admissible to assist the court in ascertaining the parties['] intent and in interpreting the contract." *Id.* "The court may consider (1) the subject matter and objective of the contract, (2) the circum-

---

[8]The plaintiffs suggest for the first time in the Democratic Party's reply brief that the state could be liable for trademark infringement on a theory of contributory infringement. We decline to reach this issue because it was not timely raised. *See Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).

stances surrounding the making of the contract, (3) the subsequent conduct of the parties to the contract, (4) the reasonableness of the parties' respective interpretations, (5) statements made by the parties in preliminary negotiations, (6) usages of trade, and (7) the course of dealing between the parties." *Id.* "Such evidence is admissible regardless of whether the contract language is deemed ambiguous," though "[e]xtrinsic evidence cannot be considered: (a) to show a party's unilateral or subjective intent as to the meaning of a contract word or term; (b) to show an intention independent of the instrument; or (c) to vary, contradict, or modify the written word." *Id.*

The state argues that the stipulation expressly reserved its right to reimbursement. The stipulation states in relevant part:

> The parties agree that this stipulation relates only to fees and costs incurred by appellees in the appeal of the District Court's July 29, 2005 Order ("the Appeal") to the date of this Order. Appellees are not entitled to an award of any fees or costs incurred in the Ninth Circuit portion of the Appeal beyond the amounts awarded under this stipulation and order, to the date of this Order. *No waiver is intended of any claims for further proceedings in the appeal or in any other aspect of the case (including district court proceedings).*

(Emphasis added.) We do not agree with the state that this language unequivocally reserved the state's right to seek reimbursement in the event of a favorable ruling from the Supreme Court. The reservation could reasonably be understood as definitively resolving liability for fees associated with the Ninth Circuit appeal, while reserving the parties' rights to seek additional fees for further proceedings on appeal, including proceedings in the Supreme Court, or proceedings on remand from the Supreme Court. We therefore

look to extrinsic evidence to discern the meaning of the parties' settlement.

**[13]** That evidence supports the plaintiffs' position. In a September 15, 2006 email discussing the proposed settlement, counsel for the Democratic Party wrote: "We understand this settlement to be final as to our claims for attorneys' fees and costs for the Ninth Circuit proceedings related to the appeal of Judge Zilly's July, 2005 decision through the date of settlement, *irrespective of further proceedings in the case*" (emphasis added). Counsel for the Republican Party sent a similarly worded email. These emails, which were sent to counsel for the state, plainly contemplated that the settlement would definitively resolve the question of fees for the Ninth Circuit appeal, irrespective of further proceedings in the case. *See Spectrum Glass*, 119 P.3d at 858 (explaining that "statements made by the parties in preliminary negotiations" are admissible to assist the court in ascertaining the parties' intent in forming the contract). One would have expected the state either to respond to the emails or to include a much clearer reservation of rights in the stipulation if the state believed the parties' settlement preserved a right to reimbursement in the event of a reversal by the Supreme Court. We conclude that the settlement definitively resolved the state's liability for fees. The order granting the state's request for reimbursement is therefore reversed.[9]

---

[9]Even if the extrinsic evidence does not show that this was the parties' shared understanding, it at least shows that the state was on notice of the meaning attached to the agreement by the plaintiffs. *See* Restatement (Second) of Contracts § 201(2) (1981) ("Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made (a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party.").

## E.  Leave to Amend

The plaintiffs challenge the district court's decision denying leave to amend their complaints to add a new claim that the enactment of I-872 violated article II, section 37 of the Washington Constitution. We review for an abuse of discretion both denial of leave to amend, *see In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 990 (9th Cir. 2008), and a district court's decision to decline supplemental jurisdiction, *see Trs. of Constr. Indus. & Laborers Health & Welfare Trust v. Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 925 (9th Cir. 2003).

**[14]** "Under Federal Rule of Civil Procedure 15(a), leave to amend shall be freely given when justice so requires," but a "district court may exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , [or] futility of amendment.' " *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010) *(quoting Foman v. Davis*, 371 U.S. 178, 182 (1962)).

**[15]** Here, the district court reasonably concluded that the plaintiffs had failed to provide "any reasonable justification for not bringing this claim in [their] initial Complaint[s]." Furthermore, the court concluded that "even if the parties had a reasonable justification for failing to raise this claim at the outset, the Court would decline to exercise supplemental jurisdiction" because the "applicability of article II, section 37 to I-872's enactment undoubtedly raises novel and complex issues of state constitutional law best decided by the state courts." *See* 28 U.S.C. § 1367(c)(1) (providing that a district court may decline to exercise supplemental jurisdiction when "the claim raises a novel or complex issue of State law"). There was no abuse of discretion.

## F.   Compelled Speech

The plaintiffs challenge a provision of Washington law providing that "[f]or partisan office, if a candidate has expressed a party or independent preference on the declaration of candidacy, that party or independent designation shall be clearly identified in electioneering communications, independent expenditures, or political advertising." Wash. Rev. Code § 42.17A.320(1).[10] The plaintiffs contend this provision requires them to engage in compelled speech, in violation of the First Amendment. Specifically, they complain that they are impermissibly required to repeat a candidate's self-professed party preference in the party's own political advertising, even if the party disagrees with the candidate's self-described party preference.

We decline to reach this issue because it does not appear that the plaintiffs sought the invalidation of § 42.17A.320(1) in their initial or amended complaints. Although the plaintiffs' pleadings sought the invalidation of numerous sections of the Washington election code, § 42.17A.320(1) was not among them. Accordingly, we deem this issue waived.

## G.   Severability

The plaintiffs argue that I-872 is not severable, and that its entire implementation should be enjoined as a result of the district court order declaring the election of precinct committee officers (PCOs) unconstitutional. We disagree.[11]

Under Washington law, "[o]rdinarily, only the part of an enactment that is constitutionally infirm will be invalidated, leaving the rest intact." *In re Parentage of C.A.M.A.*, 109 P.3d

---

[10]Formerly codified as Washington Revised Code § 42.17.510(1).

[11]"[S]everability is a question of state law that we review de novo." *Ariz. Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1283 (9th Cir. 2003) (per curiam).

405, 413 (Wash. 2005) (quoting *Guard v. Jackson*, 921 P.2d 544, 548 (1996)) (internal quotation marks omitted). "An unconstitutional provision may not be severed, however, if its connection to the remaining, constitutionally sound provision is so strong that it could not be believed that the legislature would have passed one without the other; or where the part eliminated is so intimately connected with the balance of the act as to make it useless to accomplish the purposes of the legislature." *Id.* (quoting *Guard*, 921 P.2d at 548) (internal quotation marks omitted).

Here, the plaintiffs' argument that voters would not have approved I-872's top two primary for partisan offices if they could not also vote for PCOs defies common sense. As the state's brief says, "[i]t strains credulity to suggest that Washington's voters would choose to discard the entire Top Two primary if it did not include PCO elections." The plaintiffs' severability argument is without merit.[12]

## III.   Conclusion

We reverse the order granting the state's request for reimbursement of attorney's fees. In all other respects, we affirm the district court. Each party shall bear its own costs on appeal.

## **AFFIRMED IN PART; REVERSED IN PART.**

---

[12]We need not reach the state's two alternative reasons for rejecting the plaintiffs' severability argument — that the plaintiffs abandoned this theory on summary judgment and that Washington's laws governing PCO elections are not part of I-872 and, therefore, no question arises as to whether I-872 can be severed from them.