IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| BILL & MELINDA GATES FOUNDATION, a Washington nonprofit corporation, | ) ) ) | No. 79354-3-I |
| Appellant/Cross-Respondent, | ) ) | DIVISION ONE |
| v. | ) ) | PUBLISHED OPINION |
| TODD PIERCE, | ) ) ) | |
| Respondent/Cross-Appellant. | ) ) | |

HAZELRIGG, J. — Todd Pierce was recruited away from a high-paying executive position with a technology company in San Francisco to become the first Chief Digital Officer for the Bill & Melinda Gates Foundation (the Foundation). After negotiating what the role would and, more importantly, would not be, Pierce accepted the at-will position and moved to Seattle to begin his "far-reaching and transformational" work. However, the job for which he bargained never materialized and Pierce was ultimately terminated after approximately 18 months with the charitable organization. He filed suit against the Foundation for breach of contract, promissory estoppel, and negligent misrepresentation. After a bench trial, the judge found for Pierce as to the breach claim and, in the alternative, on the theory of promissory estoppel. The judge found that Pierce did not meet his burden to prove negligent misrepresentation. Pierce was awarded damages

based largely on lost wages and stock options from his prior employer, but his request for attorney fees was denied.

The Foundation asserts that the court erred in finding for Pierce on both breach of contract and promissory estoppel, grounding its various arguments in the fact that Pierce was an at-will employee, and that the award for damages was improper. It further raises due process challenges to the proceedings as a whole, based on the manner by which the judge conducted the bench trial. Pierce cross-appeals the court's denial of his request for attorney fees.

The highly distinctive factual context of this case presents issues not heretofore considered in the body of law on employment contracts in Washington. The specific promise at the heart of the negotiations for Pierce's employment may well have been vague and unenforceable in other circumstances involving different parties. However, the Foundation was uniquely situated to provide precisely the opportunity it jointly envisioned and bargained for with Pierce, yet failed to do so. We affirm the trial court's ruling as to breach of contract and, as such, do not reach the alternative basis of promissory estoppel. At-will employees may not recover reliance damages as the trial court awarded here, but the facts of this case are such that the court is not constrained to nominal damages typically associated with a finding of breach of an at-will employment contract. Accordingly, we agree with the Foundation that the trial court erred in its assessment of damages and remand for further proceedings. While the Foundation raises serious questions as to the manner of the judge's questioning of the witnesses and interference with counsel's ability to object at trial, it fails to demonstrate prejudice and we find error was

harmless. As Pierce did not bring a suit for wages, we affirm the court's ruling denying his request for attorney fees. Affirmed in part, reversed in part, and remanded for further proceedings.

FACTS

The Bill & Melinda Gates Foundation (the Foundation) is the world's largest philanthropic organization. The Foundation has three trustees: Warren E. Buffett, Melinda A. French Gates, and William Henry (Bill) Gates, III. Buffett and the Gateses are some of the wealthiest individuals in the world; Bill Gates is the founder of technological pioneer Microsoft, Melinda French Gates had a distinguished career in technology and has been an advocate for diversity in that field since her youth, with a particular focus on gender equity, and Warren Buffett is considered one of the world's top investors as the Chairman and Chief Executive Officer (CEO) of Berkshire Hathaway.

The Foundation invests five billion dollars each year in charitable support, driven by the notion that every life has equal value. The trustees of the Foundation oversee its operations by working directly with the CEO and the Executive Leadership Team (ELT), who direct the daily operations of each program's divisions: Global Health, Global Development, Global Growth & Opportunity, U.S. Program, and Global Policy & Advocacy. Some of the projects undertaken by the Foundation include helping improve high school graduation rates and creating opportunity for higher education, water sanitation, vaccine development, women's economic empowerment, and financial services for the poor.

Dr. Susan Desmond-Hellmann joined the Foundation as CEO in 2014. Shortly after her arrival, she hired Leigh Morgan to assess the Foundation's operations. Morgan was later hired on as Chief Operating Officer (COO). Morgan reached out to Todd Pierce for support and insight regarding Information Technology (IT) operations at the Foundation. Desmond-Hellmann, Morgan, and Pierce had all worked together previously at Genentech, a San Francisco biotechnology company. When Morgan first contacted Pierce in 2014, he was a Senior Vice President at Salesforce.com (Salesforce). Morgan explained her tasks, priorities and the general landscape at the Foundation to Pierce and emphasized the need to rework IT operations.

Initially, Morgan was only seeking advice and insight from Pierce, however their discussion grew into exploring the possibility of Pierce coming to work for the Foundation. They discussed Pierce joining as Chief Digital Officer (CDO); Pierce made it clear that he only wanted to work for the Foundation if his job was broader than that of a traditional Chief Information Officer (CIO). The two considered the need to overhaul the Foundation's IT program, implement systems upgrades, and build a cross-Foundation digital strategy that would help with its philanthropic work.

In October 2014, Pierce visited Seattle to meet with senior leadership who were aware of Pierce's interest in a CDO position. At the meeting, Desmond-Hellmann told Pierce to be sure to ask for what he wanted from the Foundation. Pierce made three specific requests: to be the CDO, to be on the Foundation's ELT, and to report directly to the CEO. The Foundation agreed to the first two requests and expressly rejected the third. Desmond-Hellmann reinforced that,

should he join the Foundation, Pierce's first priority would be to fix the IT systems. The next month, Morgan emailed Pierce to indicate that Bill Gates was open to meeting with him. Prior to meeting with Gates, Morgan emailed Pierce that the "CDO role description is still forming" and included a draft list of accountabilities. She also expressly requested Pierce's input.

There had never previously been a CDO position at the Foundation. Pierce was unable to find time to provide meaningful input on the draft of CDO accountabilities from Morgan, but he later testified that he felt the draft was broad enough to encompass the opportunities he had in mind. Pierce did, however, forward some articles to Morgan about CDO positions that were beginning to emerge in other companies and organizations. In December 2014, Morgan sent Pierce a list of "high level job accountabilities for [the] CDO role." Pierce knew he would need to persuade Gates in order for the opportunity to come to fruition. The meeting between Pierce and Gates went well, but Pierce did not make any specific requests of commitment from Gates. The Foundation sent Pierce an offer letter in January 2015 which he signed and returned a month later. The parties agree that the offer letter was an enforceable contract setting forth the terms of Pierce's employment.

In exchange for Pierce's employment as CDO, the Foundation agreed to pay him a salary of $425,000 annually, a $100,000 signing bonus, retirement contributions equal to 15% of his salary, and relocation benefits. The letter also stated Pierce's employment would be "'at will' and may be terminated by you or the [F]oundation at any time for any reason with or without cause or advance

notice." Pierce accepted the position and was aware that, in doing so, he was leaving behind unvested incentive compensation at Salesforce.

Pierce was employed at the Foundation from April 2015 to October 2016. Pierce immediately began working on a digital strategy, in addition to the numerous other projects the Foundation identified as priorities. In November 2015, Pierce sent Desmond-Hellmann an email outlining his digital strategy. In response, Desmond-Hellmann questioned his focus on new programs rather than working with existing ones. She stressed the need for Pierce to pace himself given the breadth of the proposal. Pierce agreed with the feedback.

In January 2016, Pierce presented his digital strategy to the ELT, which was comprised of the presidents of the Foundation's various program divisions. Pierce followed up by presenting an updated digital strategy to Desmond-Hellmann in May 2016 and identified the need for additional budget amounts for 2016 and 2017. Pierce continued to expand and work on his project, eventually hiring a Director of Digital Platforms & Ecosystems. With Desmond-Hellmann's approval, Pierce worked on options for building out the Foundation's investment management system. In September 2016, Pierce and his IT group created a "36-[Month] Digital Roadmap."

During Pierce's time at the Foundation, numerous concerns surfaced about his leadership, team morale, and questioning the degree of Pierce's commitment to the Foundation. Pierce and Morgan repeatedly had communication issues due to Pierce's insistence on reporting directly to CEO Desmond-Hellmann, despite the Foundation's explicit rejection of his request on that matter during negotiations for

the position. Prior to his acceptance of the job offer, it was made clear that Pierce was to report to Morgan. In May 2016, Pierce again provided a presentation directly to Desmond-Hellmann. Morgan emailed the Foundation's Chief Human Resources Officer and explained that she was contemplating firing Pierce based on this conduct, which she deemed insubordinate. Morgan and Pierce met to discuss the concerns and appeared to reach an agreement on how to move forward. In September 2016, Pierce and Morgan met again and addressed further concerns Morgan had regarding Pierce's conduct. They also discussed an investigation that was underway based on Pierce's expense reimbursement practices and a violent outburst with his executive assistant. Less than two weeks later, Pierce was terminated.

Pierce filed suit in April 17, 2017, asserting claims against the Foundation for breach of contract, promissory estoppel, and negligent misrepresentation. The case proceeded to a bench trial where the court found for Pierce on the breach of contract claim and, in the alternative, promissory estoppel. The court concluded that Pierce failed to meet his burden of proof as to negligent misrepresentation. The trial court awarded Pierce $88,104 in lost Salesforce wages and $4,547,140 in "other compensation," the majority of which was based on stock options Pierce received from employment at Salesforce. The Foundation now appeals. Pierce cross-appeals the court's denial of his attorney fee request.

ANALYSIS

I.      Breach of Contract

The Foundation first asserts that the court erred in determining that it breached the contract with Pierce.  We review questions of law de novo.  Sunny Valley Irrig. Dist. v. Dickle, 149 Wn.2d 873, 880, 73 P.3d 369 (2003).  "This Court will review only findings of fact to which error has been assigned."  In re Contested Election of Schoessler, 140 Wn.2d 368, 385, 998 P.2d 818 (2000).  "It is well-established law that an unchallenged finding of fact will be accepted as a veri[t]y upon appeal."  State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).  When we review mixed questions of law and fact, this court defers to the unchallenged findings and reviews the legal conclusions de novo.  In re Marriage of Pennington, 142 Wn.2d 592, 602-03, 14 P.3d 764 (2000).  In its briefing to this court, the Foundation does not assign error to any of the 91 findings of fact.  As such, we accept all of them as verities and focus our review on the assignments of error the Foundation did allege.

"Employment contracts are governed by the same rules as other contracts."  Kloss v. Honeywell, Inc., 77 Wn. App. 294, 298, 890 P.2d 480 (1995).  The law recognizes two types of contracts: bilateral and unilateral.  Cook v. Johnson, 37 Wn.2d 19, 23, 221 P.2d 525 (1950).  A bilateral contract is one where the parties exchange promises.  Govier v. N. Sound Bank, 91 Wn. App 493, 499, 957 P.2d 811 (1998).  Here, neither party disputes that they entered into a written bilateral contract on February 15, 2015 when Pierce signed the offer letter from the Foundation.

Pierce argues, as he did in the trial court, that the Foundation did not uphold its end of the contract and breached by not providing him with the CDO position as promised. This is not a case where the focus of our analysis rests on an employee's termination, but is instead one that hinges on whether Pierce was provided the position for which he bargained. As such, one of the key facts before us is Pierce's express rejection of a CIO role that would center on IT work.

Pierce left his lucrative job as an executive at Salesforce and relocated in order to accept the newly-created CDO position at the Foundation. Further, the findings by the trial court establish that although "Bill Gates understood the CDO role, others at the Foundation did not" and "Morgan did not lay the groundwork for a CDO to succeed." The court concluded that the Foundation offered "that the CDO position would be far-reaching and transformational and, importantly, not the role of a glorified IT operations manager[,]" but the Foundation advances the position that any such offer is not enforceable. We disagree. The findings and conclusions from the trial court, testimony, and hundreds of exhibits made clear that this promise was well established and that Pierce relied on it in his acceptance of the CDO role at the Foundation.

A CDO is a new position that companies and organizations around the world are beginning to utilize. The role of a CDO has been viewed within the technology and business world as the executive position to bridge technology and market, while driving digital strategy and initiatives to fundamentally shift a business or organization.[1] In particular, discussion surrounding the emerging CDO position

---

[1] Nicholas D. Evans, The evolving role of the Chief Digital Officer, CIO (Sep. 14, 2017), https://www.cio.com/article/3224478/the-evolving-role-of-the-chief-digital-officer.html

signals that it is much broader than a CIO and likely could subsume the need for a CIO entirely.[2]

Morgan attempted to engage Pierce in defining what a CDO would be at the Foundation, but by his own admission, he did not participate in that critical stage of the process beyond sharing articles about CDO positions with other organizations. Ultimately, Morgan drafted the following accountabilities for the new role:

- Build and implement an enterprise-wide digital strategy that harmonizes across divisional and program-team boundaries to solve shared, large-scale problems relevant to our mission
- Partner with ELT members to ensure that we have a dashboard approach to utilizing key metrics across multiple foundation teams
- Set a vision for more innovative use of big data, predictive analytics, novel IT and social networking platforms, cloud-related data sharing, GIS modelling, and other digital modalities
- Be a thought-leader with the co-chairs, foundation and program leaders, anchor partners, other key stakeholders
- Facilitate experimentation, cross-program collaboration and knowledge sharing on digital/technology-related strategies
- Transform the foundation IT organization into a high-performing, nimble, innovative, and lean organization
- Partner with Co-chairs, ELT, and programs to drive for tangible, measureable results in foundation-wide digital strategies

In Washington, we follow the objective manifestation theory of contracts in which "we attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." Hearst Cmmnc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503,

---

[2] Robert Berkman, The Emergence of Chief Digital Officers, MIT Sloan Management Review (April 29, 2013), https://sloanreview.mit.edu/article/social-business-helps-usher-in-new-executive-the-cdo/

Irving Wladawsky-Berger, Why CIOs May Morph Into the Chief Digital Officer, Wall Street Journal (November 18, 2012 8:11AM ET), https://blogs.wsj.com/cio/2012/11/18/why-cios-may-morph-into-the-chief-digital-officer/

115 P.3d 262 (2005). However, in determining the parties' intent, context matters and informs the objective manifestations of the agreement. See Id. at 502-503. The present context of the agreement between Pierce and the Foundation is exceedingly unique in that both parties are high-level innovators in their respective fields and the resources available for the implementation of this newly-created role at the Foundation likely do not exist within most other organizations. These realities necessarily establish the framework upon which our review is conducted.

The trial court found the Foundation breached the contract by not providing Pierce the CDO position that he was promised. There was conflicting testimony as to how Pierce's time at the Foundation unfolded. The trial court found that there was no question Gates understood what a CDO would do at the Foundation. However, it also found that Morgan failed to lay the groundwork or facilitate the necessary transition to truly allow Pierce to fit within the Foundation's existing organizational structure as CDO. When Pierce arrived at the Foundation, he was immediately met with resistance from the present staff and internal organizational structures. This was demonstrated by Finding of Fact 50, wherein the court found that "Pierce had concerns that the Foundation was not committed to or prepared for the expanded, outward-facing CDO role he had been promised." Nonetheless, Pierce appears to have tried to make the new position work.

The Foundation takes issue with the court's description of the promised job in the conclusions of law; that "the CDO position would be far-reaching and transformational." It argues, among other things, that such terms would be too vague to be enforceable. However, the Bill & Melinda Gates Foundation is the

largest charitable foundation in the world, with trustees and a platform that provide access to resources to securely anchor such an offer well within the realm of possibility. Beyond providing the expansive financial assets to implement the visions and strategies described in the CDO accountabilities, the Foundation is uniquely situated to provide a CDO with opportunities to collaborate with decision-makers and leaders of industry across the globe.

Two of the Foundation's key arguments are that Pierce's job responsibilities could be modified by his supervisor at any time due to his status as an at-will employee and that there is no duty of good faith and fair dealing in the context of at-will employment. However, when considering that assertion within the framework of a bilateral contract such as this one, this latter argument in particular is incorrect. "There is in every contract an implied duty of good faith and fair dealing. This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). This duty does not require a party to accept a material change to the contract terms; "it requires only that the parties perform in good faith the obligations imposed by their agreement." Id. While the Foundation is correct that it retained the ability to modify Pierce's job duties because of his status as an at-will employee, what they could not do, based on the duty of good faith and fair dealing, was fundamentally change what it meant to be the CDO of the Bill & Melinda Gates Foundation. To do so would render that fundamental promise illusory.

We acknowledge what, on cursory review, could appear to be a conflict in Washington law as to the duty of good faith and fair dealing in contracts that provide for employment at-will.[3] We understand the body of case law to reflect a rather simple principle: there is no duty of good faith and fair dealing <u>as to termination of at-will employment</u>. By accepting at-will employment, the parties have expressly bargained away any right to good faith and fair dealing with regard to a decision to terminate the employment. However, as to the other terms and conditions of employment, our case law is clear that a duty of good faith and fair dealing does apply. <u>See</u> <u>also</u> <u>Badgett</u>, 116 Wn.2d at 569.

The unchallenged facts found by the trial court indicate the breach occurred in November 2015 when Morgan would no longer allow Pierce to perform his end of the bargain. "In late November 2015, Pierce took his vision for the Foundation's digital transformation to CEO Desmond-Hellmann during a semi-regular 'one-on-one' meeting."[4] This meeting offended Morgan to the point that she chastised Pierce for insubordination. In Finding of Fact 60, trial court determined that from that point forward "Morgan began a sustained campaign to frustrate Pierce's efforts to fulfill the broader CDO role."

---

[3] Some Washington cases appear to indicate that at-will employment provides no implied duty of good faith and fair dealing. <u>See</u> <u>Thompson v. St. Regis Paper Co.</u>, 102 Wn.2d 219, 685 P.2d 1081 (1984) (finding no duty of good faith and fair dealing as to termination for at-will employment); <u>See</u> <u>also</u> <u>Bakotich v. Swanson</u>, 91 Wn. App. 311, 957 P.2d 275 (1998) (declining to extend a duty of good faith and fair dealing as to at-will employee's termination).

Other cases plainly declare employment contracts are to be treated like all other bilateral contracts, which implicitly includes a duty of good faith and fair dealing. <u>See</u> <u>Comfort & Fleming Ins. Brokers, Inc v. Hoxsey</u>, 26 Wn. App. 172, 176, 613 P.2d 138 (1980) ("A contract for employment is subject to the same rules that govern the construction of other contracts."); <u>See</u> <u>also</u> <u>Rehkter v. State Dept. of Soc. and Health Servs.</u>, 180 Wn.2d 102, 323 P.3d 1036 (2014) (finding DSHS violated its duty of good faith and fair dealing in the performance of a specific term of its contracts with providers).

[4] Finding of Fact 57.

At oral argument before this court, the Foundation reinforced that they do not dispute any of the findings of fact from the trial court and agreed that we are to accept them as verities on appeal. Instead, the Foundation only challenges the conclusions of law which flow from those findings. The trial court's findings establish that after the November 2015 meeting, Pierce was not able to perform his promised role as CDO and was actively prevented from doing so by the Foundation, through Morgan. Pierce was consistently told to scale back and focus on IT. Further, the trial court found those that hired Pierce should have helped him push his digital vision forward and work to break down internal resistance, but "Morgan did nothing of substance to advance the CDO role across the organization or look for ways to push or advocate for genuine cross-programmatic collaboration or, better yet, accountabilities for such work." The trial court's determination that the Foundation breached its contract with Pierce on November 30, 2015 by not providing him with the job he was promised was a proper conclusion based on the facts adduced at trial.

Evidence supports the trial court's ruling that the parties had a meeting of the minds and did objectively manifest their intent regarding the agreement as to what Pierce's CDO position would be. The facts of this case support the court's conclusion that the Foundation kept Pierce employed in the CDO position following the November 30, 2015 meeting, but frustrated his ability to perform the job for which he had contracted. The Foundation's failure to cooperate establishes a breach of its duty of good faith and fair dealing. As expansive as the language

was that conveyed the promise, the Foundation was uniquely situated to provide exactly that which it offered, but failed to do so.

## II. Promissory Estoppel

The Foundation next argues the trial court improperly found for Pierce on an alternative theory of promissory estoppel. We agree that a party may not recover for both breach of contract and promissory estoppel.

"[T]he doctrine of promissory estoppel does not apply where a contract governs." Spectrum Glass Co., Inc. v. Public Util. Dist. No. 1 of Snohomish County, 129 Wn. App. 303, 317, 119 P.3d 854 (2005). Here, "[t]he Court concludes that the Foundation's job offer and Pierce's acceptance of it constitutes and enforceable contract." However, the court went on to conclude "[e]ven if the Foundation's offer is unenforceable as a matter of contract law, Pierce establishes all elements of a claim for promissory estoppel." These contradictory conclusions of law are mutually exclusive. See Id. The trial court found facts that established that a contract existed, which appropriately support its conclusions of law on that issue. It is improper for a party to recover on the basis of two mutually exclusive theories. We therefore strike the conclusion of law finding promissory estoppel and decline to substantively reach the assignment of error on this issue as the contract between Pierce and the Foundation governs.

## III. Damages

The Foundation avers that even if it is found to have breached the contract with Pierce, the court erred in its award of damages.

This court reviews de novo the question of whether damages were proper for Pierce's cause of action. Ford v. Trendwest Resorts, Inc., 146 Wn.2d 146, 152, 43 P.3d 1223 (2002). We review a trial court's evidentiary rulings on damages for abuse of discretion. Bakotich, 91 Wn. App. at 314. "The burden of proof is on the party seeking damages." 224 Westlake, LLC v. Engstrom Prop., LLC, 169 Wn. App. 700, 729, 281 P.3d 693 (2012).

### A. Expectation and Reliance Damages

"Washington law is clear on the parties' rights under an at-will employment contract after employment begins: Generally, an employee cannot recover damages when terminated from at-will employment." Bakotich, 91 Wn. App. at 315. "[L]ost earnings cannot measure damages for the breach of an employment at-will contract because the parties to such a contract do not bargain for future earnings. By its very nature, at-will employment precludes an expectation of future earnings." Ford, 146 Wn.2d at 157. "[A]n at-will employment contract anticipates that the employer may repudiate at any time without ramification." Bakotich, 91 Wn. App. at 316. In Bakotich v. Swanson, the court made clear that, for these same reasons, damages would also be improper under a theory of promissory estoppel in the context of at-will employment. Id. at 319-20.

Ford v. Trendwest Resorts, Inc. involved an employee who was terminated for suspicion of drinking on the job. 146 Wn.2d at 150. The employer then agreed that if the employee completed a counseling program, he would be rehired as an at-will employee in a position equal to the one which he previously held. Id. After the employee signed up for a counseling program, he called to determine his new

work schedule. The employer informed him that he could not return to the same position, but could work in a much less lucrative position. Id. After a trial, the jury determined that the employer had breached its contract to rehire the employee and awarded both "past economic damages" and "future economic damages." Id. at 151. Our Supreme Court took up the case to "determine whether lost earnings are an appropriate measure of damages when an employer breaches a contract to hire an at-will employee." Id. at 152. The Court concluded that the employee had no reasonable expectation of future earnings due to his at-will status and reversed and remanded for entry of an award for only nominal damages. Id. at 158. It is noteworthy that the Supreme Court in Ford stated that Bakotich reached the right conclusion for the wrong reason; specifically that anticipated earnings are highly speculative, but also that, fundamentally, the parties do not bargain for future earnings in the context of at-will employment. Id. at 157.

Bakotich is more analogous to the present case as it involved an employer luring a prospective employee away from his current position to begin employment as the manager of an outlet the employer hoped to open. However, the outlet never manifested so there was no new position for the employee after he left his prior employment. 91 Wn. App. at 313. The trial court prevented the employee from presenting any evidence of damages, which included evidence of loss of earnings, future earnings, and loss of pension and benefits. Id. at 314. Division Two of this court found the exclusion of that evidence was proper due to the speculative nature of such calculations and the fact that the prospective employment was at-will. Id. at 314, 316.

Here, the damages awarded to Pierce are all predicated on exactly the sort of calculations rejected in both Ford and Bakotich. The court based the award on loss of the higher wage from Pierce's employment at Salesforce, along with stock options that were part of his compensation there. This was fundamentally an improper measure as Pierce would have lost the higher wage and stock options from Salesforce even if the CDO role at the Foundation became exactly what he had envisioned. Any entitlement to that compensation had long since dissipated by the time the Foundation breached the contract with Pierce, roughly seven months into his employment there. As such, there is no causation to tie such damages to the breach found by the trial court. Because the trial court concluded that Pierce's employment was at-will, there was no bargain for future earnings or job stability under Washington case law. Ford would suggest a result of only nominal damages. 146 Wn.2d at 152.

Another noteworthy consideration in our review of the damages awarded is that Pierce had full knowledge of what he was foregoing in terms of future salary or stock options by accepting this at-will position with the Foundation as the job he left at Salesforce was also at-will. During the negotiations, Pierce had the opportunity to request a term for reimbursement for the stock options he was foregoing, generally or specifically in the event of termination during a set period, if he had so desired. In Bakotich, the potential employee was never even given the opportunity to attempt the job he was offered and the court still rejected damages. Here, Pierce was employed for nearly 18 months with the Foundation and provided all the compensation he bargained for during that time. Washington

courts have rejected the assertion that reliance damages would be proper in the context of at-will employment. See Ford, 146 Wn.2d at 155-58; See also Bakotich, 91 Wn. App. at 316-17. Following that precedent, we agree with the Foundation that the damages awarded to Pierce were erroneously calculated.

        B.      Measure of Damages and Valuation

The Foundation further argues that even if damages were proper in the context of at-will employment, the evidence does not support the amount of damages awarded here. The amount of damages awarded under a specific measure is a discretionary determination for the trier of fact, provided it falls within the range of relevant evidence. Womack v. Von Rardon, 133 Wn. App. 254, 262, 135 P.3d 542 (2006). The case at hand calls for both a temporal analysis of damages and careful assessment as to value.

An essential first step for a trial court when considering damages in this sort of employment litigation, particularly where the position is new or unsettled, is to make a factual determination as to a reasonable period of time for transition and attempted performance before finding that a breach has occurred. See Barrett v. Weyerhaeuser Co. Severance Pay Plan, 40 Wn. App. 630, 638, 700 P.2d 338 (1985) (affirming trial court's factual determination that three days in a new position was too limited to justify a finding that new duties were unreasonable). It is reasonable that there would be an initial period of time where the position is fleshed out in more detail or significant time is spent on training and orientation rather than the defined job duties, particularly when the position itself has never existed within the organization. Here, the court reasonably determined that there was a period

of time where the CDO role was understandably in flux and, later, a finite point when the Foundation breached. This is critical because Pierce is not entitled to damages for the period of time he was employed with the Foundation before the breach. See Bakotich, 91 Wn. App. at 316-17. Neither is he entitled to damages after termination because he was an at-will employee. Id. at 315. Pierce may only recover for the period of time between the breach and termination, therefore this factual determination is not only proper, but fundamental to establishing the necessary framework for the inquiry into damages.

Finding of Fact 81 states that, "starting by at least November 30, 2015, Morgan failed to cooperate with Pierce in good faith to realize the CDO opportunity during his employment or seek modification of the parties' deal when there was still an opportunity to mitigate harm." The court further explained its assessment of the time period leading up to breach in Conclusion of Law 105: "Morgan's earlier failure to take any action on the Clarity recommendations or otherwise set up the CDO role for success are troubling, but the Court cannot say with certainty that Morgan actively frustrated Pierce's purpose prior to his November 2015 meeting with the CEO." The court may award Pierce damages only for the period from November 30, 2015 when the breach occurred up to October 10, 2016, when he was terminated.

Only after determining the temporal aspect of the claim for damages does the court turn to valuation. Here, the evidence to support the award of damages was primarily Pierce's testimony after the judge specifically asked him to evaluate the amount and establish a value as to his stock options from Salesforce. Some

documentary exhibits were also submitted on this issue, including some basic spreadsheets created by Pierce. During his testimony, Pierce used language like "hypothetically" when he explained how he had loosely calculated the stock value. In addition to lacking a proper basis in the law, the evidence underlying the court's calculation of damages was insufficient to support the amount awarded.

The Foundation is correct that these valuations are complex and of the sort that commonly involve expert testimony. See Aubin v. Barton, 123 Wn. App. 592, 98 P.3d 126 (2004). However, these more specific questions as to the value of the Salesforce stock are beyond the proper inquiry as to the scope of damages owed to Pierce because the court erred in awarding reliance damages. "[T]he general measure of damages for breach of contract—which is applicable to employment contract cases—is that the injured party is entitled (1) to recovery of all damages that accrue naturally from the breach, and (2) to be put into as good a position pecuniarily as he would have been had the contract been performed." Knox v. Microsoft, 92 Wn. App. 204, 208-09, 962 P.2d 839 (1998). "The measure of damage in any particular case will depend upon the facts in that case." Dunseath v. Hallaur, 41 Wn.2d 895, 904, 253 P.2d 408 (1953). Washington law generally directs that the proper measure of damages is nominal, however the facts of the case at hand are such that we are not so constrained. The context and parties are unique and the stakes high, therefore we find it proper to look beyond nominal damages.

It is not just that the Foundation is the preeminent entity of its sort in the world, but also that it achieves its results from successful innovation and mastery

of a digital landscape. The Foundation functions at this unusually high level, in part, because it is able to recruit exceptional talent, not only due to the expanse of its resources, but also because of the professional network to which it is privy. Such access is substantially attributable to the prestige of the Trustees and of other front runners of various industries who they have brought into the Foundation. As set out above, the breach here occurred by not providing Pierce the position for which he bargained and the opportunities that flow from such a cutting-edge position within a leading organization in the field of global philanthropy. The assessment of damages here rests on a determination of the value of this "far-reaching and transformational" job; what is the inherent value of having this highly specialized role at this precise charitable foundation guided by these particular leaders of industry? The damages to Pierce stem from the impact on his marketability. He cannot necessarily expect another high level CDO position because he wasn't doing that work at the Foundation, so the trial court must determine the value of that rather ephemeral loss.

At oral argument, the Foundation claimed Pierce was provided everything he was owed in compensation, however our inquiry as to proper damages does not end there. In this case, we do not simply look to the paychecks earned for time spent at work, for the Foundation is correct as to that point. The breach here is more complex and conceptually expansive. The proper measure of damages owed to Pierce, given the nature of the Foundation's breach, is that of the difference in value between the job he was promised and the job he was provided after his late November 2015 meeting with Desmond-Hellman when the court

determined Morgan began to actively frustrate Pierce's purpose. Unfortunately, there is no evidence of the value of either of those roles in the record before us, nor the difference between them. While Pierce attempted to demonstrate the value of Salesforce compensation he abandoned when he took the role at the Foundation, that was not the proper inquiry.

We recognize this calculation will be complex, however countless attorneys have ably proved monetary value to juries and trial judges for seemingly intangible damages. See, E.g., Kirk v. Wash. State Uni., 109 Wn.2d 448, 746 P.2d 285 (1987) (affirming $353,791 damages award for pain and suffering to twenty-year-old cheerleader who sustained permanent elbow injury during unsupervised cheerleading practice); Jones v. Rumford, 64 Wn.2d 559, 392 P.2d 808 (1964) (affirming $500 damages award for nuisance due to odor and flies from chicken breeding plant next door to plaintiff); Bunch v. King County Dept. of Youth Servs., 155 Wn.2d 165, 116 P.3d 381 (2005) (affirming award of $260,000 for non-economic damages in employment discrimination suit). We are confident that the same can be done here. Evidence for this sort of inquiry will likely include experts in the field and comparisons of employment opportunities; while it is certainly a difficult task, it is not an insurmountable one. The current record of the evidence presented to the trial court is insufficient to establish the proper damages award in line with this opinion. Having established the correct inquiry as to loss, an exceedingly unique opportunity to hold a specialized and innovative role within one of the world's foremost philanthropic foundations, the parties now must assess its

monetary value. We remand for recalculation of damages consistent with this opinion.

IV.     Fair Trial

The Foundation argues it was deprived of a fair trial before a neutral arbitrator when the judge interjected during the bench trial and took control of the court room at numerous times. It further avers the court prevented it from making objections, in violation of ER 614(c).

A fundamental liberty interest protected by the due process clause of both the Fourteenth Amendment and article I, section 3 of the Washington Constitution is the right to a fair trial. Estelle v. Williams, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976); State v. Davis, 141 Wn.2d 798, 824, 10 P.3d 977 (2000). "A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955); State v. Moreno, 147 Wn.2d 500, 507, 58 P.3d 265 (2002). Normally, a trial court may ask questions of the witnesses without violating the due process right to a fair trial. ER 614(b); Moreno, 147 Wn.2d at 509-11.

A.     Judicial Participation in Witness Testimony

Here, the court did ask numerous questions of both parties' witnesses throughout the trial. A bench trial puts "unique demands" on the judge presiding, "requiring them to sit as both arbiters of law and finders of fact." State v. Read, 147 Wn.2d 238, 245, 53 P.3d 26 (2002). ER 614 expressly allows for the court to call witnesses and to question them, though such questioning is expressly limited

by the state constitution's prohibition on judicial comment on the evidence.  WASH. CONST. art. IV, § 16.  Judicial comment on the evidence is naturally less of a concern in the context of a bench trial, however, as where the facts in a case are "passed upon by the trial judge alone, [the judge] may be presumed to have disregarded all improper and incompetent evidence."  Whiting v. City of Seattle, 144 Wn. 668, 675, 258 P. 824 (1927).  This presumption in favor of the trial judge is a guiding principle for our analysis of this issue.

The Foundation argues that the judge usurped the role of counsel by actively examining witnesses and otherwise directing testimony, but in the context of a bench trial, the judge was also the finder of fact and such inquiry is proper under ER 614(b).  "In a case without a jury, the judge has much broader discretion to question a witness."  5A Wash. Prac., Evidence Law and Practice § 614.5 (6th ed.).  While the court's participation in testimony here was extensive, much of the direction by the judge was to avoid repetition or move past topics she, as the trier of fact, felt needed no further exploration.  "Trial judges have wide discretion to manage their courtrooms and conduct trials fairly, expeditiously and impartially . . . . We, therefore, review a trial judge's courtroom management decisions for abuse of discretion."  In re Marriage of Zigler and Sidwell, 154 Wn. App. 803, 815, 226 P.3d 202 (2010) (internal citations omitted).  Particularly in a bench trial, this may manifest as a more active role in directing witness testimony for the sake of efficiency.

The Foundation further avers that, at times, the judge testified either by answering questions from counsel before the witness could respond, or framing

her questions in a way that ventured into testimony. ER 605 states, "[t]he judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." Again, while the court's involvement was pervasive, such that the experienced practitioners here may well have perceived it as invading their respective roles in the proceedings, many of the excerpts from the trial transcripts cited demonstrate that the judge was summarizing prior testimony. Heavy handed as it may have been, the court may operate its courtroom with justice and efficiency in mind.

An assignment of error claiming that the judge's conduct at trial prevented a litigant from the basic right to a fair trial is serious one. While the Foundation went to great lengths to count the number of interjections by the judge and set them out in a grid attached to their briefing on appeal, they failed to put forth similar effort to demonstrate the prejudice that may have resulted from this conduct or otherwise explain how this constitutes an abuse of discretion under the highly deferential standard. As such, we find no error on this matter.

B.     Counsel's Ability to Object

The Foundation's claim that it was denied a fair trial also rests on the assertion that the court prevented it from objecting during proceedings. ER 614(c) states "[o]bjections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present." As explained above, in the context of "a bench trial, there is even a more 'liberal practice in the admission of evidence' on the theory that the court will disregard inadmissible matters." State v. Jenkins, 53 Wn. App. 228, 231, 766 P.2d

499 (1989) (quoting State v. Miles, 77 Wn.2d 593, 601, 464 P.2d 723 (1970)). Though we are skeptical of the court's approach to addressing the Foundation's attempts to object, the Foundation utterly failed to identify any harm stemming from this directive.

There is nothing in the record to demonstrate later attempts by the Foundation's trial counsel to preserve their intended objections; for example, by filing written objections the next day or seeking to make an offer of proof. Part of its argument rests on claims of hostility from the trial court judge. However, once removed from the heat of battle as it were, the Foundation does not identify in its briefing to this court objections it would have made, but for the trial judge, or evidence that was improperly admitted in the absence of those intended objections. This court, for obvious reasons, takes seriously claims that a trial court judge would prevent a litigant from making objections on the record, but we cannot engage in any meaningful inquiry if the party alleging such error fails to identify how their strategy was impacted or otherwise demonstrate resulting harm.

The Foundation moved for a new trial or, in the alternative, reconsideration soon after the conclusion of proceedings. Pierce argues in briefing that this motion arrived shortly after the publication of a case from this court addressing similar interjections in a bench trial by the same judge. However, the record before us does not include a response from Pierce, transcripts, or indications that argument was taken. We have only the motion, its appendices and the court's ruling denying the motion. The Foundation's motion largely mirrors its argument on this matter in its briefing on appeal; while it points out the conduct to which it assigns error, the

Foundation fails to establish prejudice. When a claim as serious as this is raised on appeal, the party bringing the challenge bears the responsibility to demonstrate, or at least allege, the specific harm that ensued from the judge's conduct. In light of the presumptions in favor of the trial judge in the context of a bench trial, the deferential abuse of discretion standard of review on appeal and the absence of a showing of prejudice, we find no error.

V.      Cross-Appeal of Denial of Attorney Fees

Pierce cross-appeals the court's denial of his request for attorney fees at the conclusion of trial. Our court applies a two-part review of attorney fee awards. Gander v. Yeager, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012). First, we review de novo whether a legal basis exists for awarding attorney fees by statute, under contract, or in equity. Id.; Niccum v. Enquist, 175 Wn.2d 441, 446, 286 P.3d 966 (2012). We then apply an abuse of discretion standard to a decision to award or deny attorney fees and the reasonableness of any such attorney fee award. Gander, 167 Wn. App. at 647; Freeman v. Freeman, 169 Wn.2d 664, 676, 239 P.3d 557 (2010); Rettkowski v. Dep't of Ecology, 128 Wn.2d 508, 519, 910 P.2d 462 (1996).

Here we must first determine whether RCW 49.48.030 provides a basis for attorney fees. The relevant portion of RCW 49.48.030 states: "[i]n any action in which any person is successful in recovering judgment for wages or salary owed to him or her, reasonable attorney's fees, in an amount to be determined by the court, shall be assessed against said employer or former employer." The trial court

properly determined that this was not a suit for wages, but instead for breach of contract and promissory estoppel.

There is no question that Pierce was paid the salary owed to him during his time with the Foundation. "RCW 49.48.030 authorizes an award of attorney fees for employees who must sue in order to collect wages owed from their employers." Int'l Union of Police Ass'n, Local 748 v. Kitsap County, 183 Wn. App. 794, 798, 333 P.3d 524 (2014). "[T]he statute has been construed to include awards that were not for wages for work actually performed, but rather, money due by reason of employment." Gaglidari v. Denny's Rest., Inc., 117 Wn.2d 426, 449, 815 P.2d 1362 (1991). Here, as the court's order denying fees explains, the only reason "wages" are even at issue is because the award for damages was predicated on what Salesforce would have paid Pierce as opposed to what the Foundation did pay him during the same time. As explained in Section III, this was not the proper measure of damages, but even if the correct analytical framework had been used, this is not an instance where Pierce was owed wages for work completed or work he was further contracted to do. The court properly denied Pierce's request for attorney fees.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

WE CONCUR:

Mann, C.J.